### HEDIN v. UNITED STATES.
No. 45407.

Court of Claims.
Jan. 6, 1947.

Arthur G. Lambert, of Washington, D. C. (Lambert, Hart & Northrop, of Washington, D. C., on the brief), for plaintiff.

James J. Sweeney, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff, an individual, was formerly a member of a partnership which, on July 23, 1938, made a contract to construct two buildings for the Veterans Administration at Bedford, Massachusetts. The plaintiff has succeeded to the rights of the partnership under the contract. In this opinion the word "plaintiff" will be used, for convenience, to describe either the partnership or the individual plaintiff, when activities in relation to the contract are discussed.

The first ground of claim asserted by the plaintiff is that the Government made an excessive deduction from the contract price, because the amount of rock actually excavated turned out to be only $42\frac{1}{2}$ cubic yards, whereas the estimated amount stated in the contract was 1200 cubic yards. Our findings 3, 4, and 5 show that the invitation for bids and the contract stated that the estimated quantity of rock to be excavated was 1200 cubic yards, and that if there should be more or less than that amount, when the actual excavation was done, an addition to or a deduction from the contract price should be made at the rate of $7 per cubic yard. The very great deficiency of rock resulted, of course, in a large deduction. The plaintiff says that the contract, properly construed, did not authorize the application of the $7 rate to so large a deficiency; that the parties contemplated, when they made the contract, that any excess or deficiency which would be found would be relatively small and would therefore have no important bearing on the contract price. The plaintiff says that in fact the current price at Bedford for excavating rock was $3 per cubic yard and that he subcontracted the excavation work for that price. In his adjustment of the deficiency with his subcontractor he was, therefore, only able to deduct $3 per cubic yard for the deficiency, and hence bore a loss of $4 per cubic yard as a result of the deduction. The plaintiff urges that, since the rate of deduction stated in the contract was not intend-

ed to apply to so large a deduction, the provisions of Article 4 of the contract which we have quoted in our finding 6 are applicable, and hence the true situation, when discovered, should have been treated as a subsurface and latent condition differing materially from the condition contemplated in the contract, and therefore calling for an equitable adjustment of price rather than the application of the $7 rate, regardless of the lack of equity in the result of its application.

■ We are inclined to agree with the plaintiff that the contract provision for deducting $7 per cubic yard is not applicable to the situation that developed in this case. The invitation for bids called for a lump sum bid for the work. It stated the estimated yardage of rock excavation, to assist the bidder in computing his bid. This was, it seems to us, a representation that this estimate was reasonably accurate, and was based upon some investigation or knowledge which would make it so. Then the invitation stated the $7 per cubic yard price for excesses or deficiencies in the estimated yardage. A bidder might well discover that this $7 price was wrong. If it was, and if he made a close bid based upon a materially smaller unit figure which the excavation would actually cost him, then if the yardage turned out to be much less than the estimated amount, he would be badly hurt by the deduction at the $7 rate which would be in excess of the figure he actually used in computing his bid. Hence we are inclined to think that a bidder who, in those circumstances, received the contract, would not be bound to permit a deduction to be made at the arbitrary figure for such an extraordinary deficiency of yardage.

■ The plaintiff has not, however, shown that his situation is like the one described above. He asks for an equitable adjustment of the deduction but he does not show us what would be an equitable adjustment. His subcontractor, Dooley Brothers, agreed to do the rock excavation for $3 per cubic yard, but that had no effect upon the plaintiff's computation of his bid, for he had no communication with Dooley Brothers until several days after his bid was in and the contract signed. If he had other bids from persons who wished to subcontract the excavation work, or if he had so much as conversations with persons who told him what the local rate for rock excavation was, it would seem that he could easily have proved that fact. But he has not proved it. Being a Baltimore contractor and having, so far as the proof shows, no information about local rates at Bedford, it would have been unlikely that he would have estimated rock excavation at Bedford at an amount materially less than the figure stated in the invitation for bids to be the price for excavating rock. If the contracting officer had undertaken to arrive at an equitable adjustment with the plaintiff, he could not, if he had had before him the evidence which is before us, have determined what would be an equitable rate of deduction. It would not have been equitable to make the deduction at the $3 rate and leave the plaintiff with an unearned profit of $4 per cubic yard for a large quantity of rock which he did not excavate, but which he estimated in his bid at the $7 rate. The plaintiff is not entitled to recover on this portion of his claim.

The rest of the plaintiff's claim relates to damages alleged to have been caused to him by interference by the W.P.A. with his work and that of his subcontractor for the brick work on the buildings, Allen Construction Corporation, to whose use the plaintiff seeks to recover a part of the alleged damages.

■ The plaintiff's contract for the buildings included the installation of such plumbing facilities as water lines, sanitary sewer lines, and surface water drain pipes to points five feet outside the exterior walls of the buildings. It was evident, therefore, that at those points connections would be made by others with these facilities, and they would be extended, through ditches, to their destinations away from the new buildings. As shown in our finding 19, Article 13 of the contract provided that the Government might award other contracts and that the plaintiff should cooperate with other contractors. The Government did carry on other work as a

W.P.A. project, which work included laying sewer, water, and steam service lines, grading, leveling, and road and sidewalk construction. The plaintiff claims that the doing of this work by the W.P.A. interfered with his work and that of the Allen Company in two respects: first, in that ditches were dug and earth piled on the surface in the neighborhood of the buildings which the plaintiff was constructing, making it more difficult to carry materials, build scaffolding, etc.; second, that in its work of ditching and clearing, the W.P.A. used explosives, causing the workmen of plaintiff and the Allen Company to seek safety, thus interrupting their work.

We have no doubt that the fact that the W.P.A. work was going on was an inconvenience to the plaintiff, and that he could have done his work more economically if the W.P.A. ditches and other work had not been in progress. But the Government had the right to do these other things, in fact the buildings which the plaintiff was building would have been of no use without the connections which the W.P.A. made through the ditches of which the plaintiff complains. Unless, therefore, the W.P.A. did its work in a manner inconsiderate of the plaintiff's interests, there was no breach of the contract. The plaintiff claims that ditches were left open longer than was necessary, but the evidence seems to us to show that, on the whole, the W.P.A. did its work in about the same way that a private contractor of the same kind of work would have done it, and did not disturb the plaintiff's work appreciably more than would have been the inevitable consequence of the fact that the two jobs were done concurrently. The plaintiff's evidence does not make it possible to attribute any measurable amount of additional cost to any particular act of interference which might be found to have been so inconsiderate of the plaintiff's interests as to have been a breach of contract by the Government.

With regard to the dynamiting activities of the W.P.A., the evidence shows that a considerable part of the blasting took place so far from plaintiff's work that it could not have amounted to a substantial interference. Although the plaintiff began, early in October 1938, to make informal notes of loss of working time due to blasting, the Government was given no notice that such a record was being kept, and hence had no opportunity to check its accuracy, or observe for itself whether the statements in the notes were true. No mention was made of blasting in any written communication from the plaintiff to the Government until May 10, 1939. In that letter there was a bare mention of blasting as an interference. Even thereafter there were no definite protests or claims, giving details which could be checked upon. Not until June 1939 were the informal notes kept by the plaintiff's employees collated into a list of the alleged interferences, and even this list or its existence was not disclosed to the Government. Not until the first hearing in this case in 1942 was any statement given by the plaintiff of the alleged times, places, and extent of supposed interferences by blasting. At that time, of course, no witness for either the plaintiff or the defendant had any recollection of any of the listed incidents, so that the claim is left to rest completely upon the informal notes made in 1938 and 1939. The proved and unexplained discrepancies in the records of the plaintiff with regard to interference by the W.P.A. other than by blasting, which records were much more regularly made than those relating to blasting, contribute to our lack of confidence in the plaintiff's evidence. We conclude, therefore, that the plaintiff has not adequately proved any damages resulting from illegal interference with its work by the W.P.A.

As to the plaintiff's brick subcontractor, the Allen Company, its offered proof of damage consists in showing what it cost it to perform its subcontract, and what, as it claims, it should have cost it under normal conditions. This evidence is much too vague to be a basis for decision. There may have been many factors in a situation like this that kept it from being completely normal, and most of those factors may have been factors which involved no fault on the part of the Government.

The Government has interposed a plea of fraud, and has insisted that, regardless of the merits of the plaintiff's claim, it should be adjudged forfeited under section 172 of the Judicial Code, 28 U.S.C.A. § 279. We shall not discuss the discrepancies and inconsistencies in the plaintiff's evidence to which the Government points in support of its plea. We conclude, as did the Commissioner of this Court, who observed the witnesses and their demeanor, that no such lack of good faith in the presentation of evidence has been shown as to amount to fraud within the meaning of section 172. The Government's plea of fraud is therefore dismissed.

The plaintiff's petition is dismissed. It is so ordered.

WHALEY, Chief Justice, and JONES, WHITAKER, and LITTLETON, Judges, concur.